IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **NIDAL A. ALZURAQI**, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:12-CV-223-L** |
| | § | |
| **GROUP 1 AUTOMOTIVE, INC.,** | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court is Defendant's Motion for Summary Judgment (Doc. 18), filed November 16, 2012. After careful consideration of the motion, response, reply, briefs, appendices, record, and applicable law, the court **grants in part and denies in part** Defendant's Motion for Summary Judgment. Defendant's Motion for Summary Judgment is **granted** as to Plaintiff's Title VII and ADEA discrimination claims based on customer assignments and Plaintiff's Title VII employment termination claim. Accordingly, these claims are **dismissed with prejudice**, together with Plaintiff's disability discrimination claim, which Plaintiff elected not to pursue in this action. Genuine disputes of material fact exist as to Plaintiff's hostile work environment and ADEA employment termination claims. Defendant's Motion for Summary Judgment is therefore **denied** as to these claims, which remain for trial.

## I.     Procedural and Factual Background

Plaintiff Nidal A. Alzuraqi ("Alzuraqi" or "Plaintiff") brought this action against Defendant Group 1 Automotive, Inc. ("Group 1" or "Defendant") on January 20, 2012, asserting claims under the Age Discrimination in Employment Act ("ADEA") and Title VII of the Civil Rights Act of 1964,

as amended ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, for hostile work environment and discrimination based on disability,[1] age, religion, and national origin.  Plaintiff alleges that he has "sustained economic damages and has endured compensatory damages in the form of future loss, emotional distress, pain and suffering, inconvenience, mental anguish and loss of enjoyment of life," as a result of Defendant's harassment and discrimination. Pl.'s Compl. 4-5. Plaintiff seeks statutory damages, prejudgment and postjudgment interest, costs of court, and attorney's fees.

The court now sets forth the undisputed facts, which are stated in accordance with the standard by the court in section II of this opinion.  Alzuraqi is a Muslin American of Palestinian descent.  From October 2009 to April 4, 2010, Alzuraqi worked for Courtesy Nissan automobile dealership, which is owned and operated by Group 1, as one of two business managers in the finance department.  Alzuraqi was 51 years old during the time at issue.  Pl.'s App. 1, ¶ 2; 3, ¶ 4.  This was the second time that Alzuraqi worked for Courtesy Nissan.  He was asked to work at Courtesy Nissan the second time by Courtesy Nissan general manager Cecil Turner, Jr. ("Turner").  Alzuraqi had worked under Turner before at two prior dealerships.  *Id.* 1, ¶ 3.  In a declaration, Alzuraqi acknowledges that he was previously fired by Turner at another dealership:  "Turner fired me from [this] prior employment because when he came on board as the General Manager of the dealership, I was making $20,000 a month.  Turner wanted to cut my pay in half, but the corporate office said that was not permitted. So he fired me." *Id.*  Alzuraqi's prior employment and termination by Turner are not at issue in this case, except to the extent that Defendant seeks to rely on it to support its defense based on the "same actor inference" argument, which is discussed herein more fully.

---

[1]  In his response to Defendant's summary judgment motion, Plaintiff states that he "hereby waives his claim of disability discrimination."  Pl.'s Resp. 6 n.2.  As this claim has been withdrawn, it is no longer before the court, and the court will not address it in ruling on Defendant's summary judgment motion.

Alzuraqi was initially supervised by finance director Gary Lindsey ("Lindsey") at Courtesy Nissan, and Lindsey's direct supervisor was Turner. According to Alzuraqi, Turner did not use racial or ethnic slurs toward him at the two prior dealerships; however, during his second time at Courtesy Nissan, approximately three to four times per week, Turner referred to Alzuraqi as a "towelhead"; "raghead"; "rock thrower"; "sand nigger"; "terrorist"; "fucking Palestinian"; and "fucking Muslim." *Id.* 2, ¶ 4(a)-(h). "On one occasion, [Turner] told [Alzuraqi] that he was glad that [Alzuraqi] wasn't going to have any more kids, because that meant [fewer] Palestinian kids in the world." *Id.* ¶ 4(i). Another time, Turner was standing in the hall at the entrances to Alzuraqi's and Lindsey's offices and complained that the Persian food purchased by Lindsey for lunch smelled like "fucking camel shit." *Id.* ¶ 4(l). Turner also referred to Alzuraqi as "shithead." *Id.* ¶ 4(m). According to Alzuraqi, although this term is not obviously based on his religion or national origin, Turner, who is black, did not treat other employees, including black employees, in the same manner as Alzuraqi was treated. *Id.* ¶ 4(n).

In addition to the foregoing, Turner would refer to Alzuraqi, who was the oldest of those who worked at the dealership, as "old man" or "old fart" and would state that Alzuraqi was unable to remember something because he was "old." *Id.* Such incidents occurred approximately one to two times per week. Used car sales manager Adam Moore ("Moore") joined Turner in making derogatory comments about Alzuraqi's age but did so less frequently. *Id.* At the time, Turner was in his early thirties and Moore was in his twenties.

In his declaration, Alzuraqi states that Turner made the work place feel like a "war zone." *Id.* 3, ¶ 9. Alzuraqi complained frequently to Lindsey about Turner's conduct when Lindsey was his supervisor. According to Alzuraqi, Lindsey was fired in December 2009, and he "never did anything

constructive to solve the problem" before he left the company. *Id.* 3, ¶ 6.  Alzuraqi, on his own

initiative, planned his work in an attempt to minimize his contact with Turner and would frequently

close and lock the door to his office to avoid Turner. *Id.* 3-4, ¶¶ 6, 9.  Although his performance did

not suffer as a result of Turner's conduct, Alzuraqi asserts in his declaration that Turner's remarks

distracted him, made the work environment at Courtesy Nissan more stressful, and also made it more

difficult for him to perform his duties as finance manager.  During his employment at Courtesy

Nissan and for a period of time after leaving the company, Alzuraqi states that he was "emotionally

distraught" as a result of Turner's conduct and remarks about his religion and heritage. *Id.* 4, ¶ 9.

Alzuraqi's employment with Courtesy Nissan was terminated on April 4, 2010, during a

meeting with David Sung ("Sung"), who was Alzuraqi's direct supervisor at the time, and Todd

Wright ("Wright"), who was promoted to general sales manager close to the time that Alzuraqi was

fired. *Id.* 1, ¶ 2.  Wright did most of the talking during the meeting and told Alzuraqi that Turner

had made the decision to fire him because he did not "'fit in' with the team." *Id.*  According to

Alzuraqi, he was not given any other reason as to why he was being terminated. *Id.*  He further states

in his declaration:

> Although Courtesy Nissan . . . has claimed in this lawsuit that I was fired for
> customer complaints and treating customers poorly, no one ever told me during my
> employment . . . that a customer had complained about me.  In fact, I often received
> bonuses due to a good CSI score, which is a score based on a customer's rating of my
> job performance.

*Id.*

On November 16, 2012, Group 1 moved for summary judgment on Alzuraqi's Title VII and

ADEA claims.  As discussed herein, the court determines that Group 1 is entitled to judgment on

some, but not all, of the claims asserted by Alzuraqi in this case.

II.     **Motion for Summary Judgment Standard**

Summary judgment shall be granted when the record shows that there is no genuine dispute

as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas

Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine"

if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary

judgment, the court is required to view all facts and inferences in the light most favorable to the

nonmoving party and resolve all disputed facts in favor of the nonmoving party.  *Boudreaux v. Swift

Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  Further, a court "may not make credibility

determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v.

Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the

nonmoving party's case, the party opposing the motion must come forward with competent summary

judgment evidence of the existence of a genuine dispute of material fact.  *Matsushita Elec. Indus.

Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  On the other hand, "if the movant bears the burden

of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative

defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense

to warrant judgment in his favor."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)

(emphasis in original).  "[When] the record taken as a whole could not lead a rational trier of fact

to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Id.*  (citation omitted).

Mere conclusory allegations are not competent summary judgment evidence, and thus are

insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## III.   Analysis

The court first discusses the parties' contentions regarding Plaintiff's hostile work environment claim based on age, religion, and national origin.

### A.      Hostile Work Environment Claim

Group 1 contends that Turner's and Moore's references to "old fart," "old man," and other nicknames that included the word "old" are not severe enough to be actionable, particularly since terms like "old fart" have been held by the Fifth Circuit to be insufficient to establish discrimination.

Def.'s Mot. 9 (citing *Waggoner v. City of Garland, Texas*, 987 F.2d 1160, 1166 (5th Cir. 1993)). Because Turner was aware of Alzuraqi's age, national origin, and religion when he recruited Alzuraqi for the position at Courtesy Nissan, Group 1 maintains that the "same actor inference" rule enunciated in *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996), applies to Plaintiff's hostile work environment claim. According to Group 1, "it is illogical . . . that Turner would have hired an individual possessing a protected characteristic that he disliked for the sole purpose of harassing that same individual." Def.'s Mot. 9. In addition, Group 1 contends that Alzuraqi's hostile work environment claim fails because Alzuraqi testified in his deposition that the alleged statements by Turner and Moore did not impact his ability to do his job.

Ordinarily, to establish a *prima facie* case of harassment alleging a hostile work environment claim under Title VII, an employee must raise a genuine dispute of material fact or prove: (1) that he belongs to a protected class; (2) he was subject to unwelcome harassment; (3) the harassment complained of was based on his protected characteristic; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). In *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), the Supreme Court modified this test with respect to cases in which the alleged harasser is a supervisor with immediate or higher authority over the harassed employee. *Celestine*, 266 F.3d at 353-54 (citation omitted). In such cases, the employee need only meet the first four elements of the test. *See id.* Because the alleged harasser here (Turner) had authority over Alzuraqi, Alzuraqi need only satisfy the first four elements. For purposes of its motion, Group 1 focuses only on the fourth of these elements.

**Memorandum Opinion and Order – Page 7**

The fourth element of the test is met only if the harassment was "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment." *Id.; Ramsey*, 286 F.3d at 268.  If the conduct at issue was not severe or pervasive, the employer cannot be held vicariously liable for the supervisor's actions.  *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 409 (5th Cir. 2002).  If, however, the conduct was severe or pervasive, the employer may avail itself of the *Ellerth/Faragher* affirmative defense in an attempt to avoid liability.  *Wyatt*, 297 F.3d at 409; *Pfeil v. Intecom Telecomms.*, 90 F. Supp. 2d 742, 749 (N.D. Tex. 2000). This defense is comprised of two elements, both of which an employer must establish to avoid liability under Title VII: (1) the employer exercised reasonable care to prevent and correct promptly any racially harassing behavior; and (2) the plaintiff employee unreasonably failed to take advantage of any available preventive or corrective opportunities.[2]  *Ellerth*, 524 U.S. at 765; *Wyatt*, 297 F.3d at 409.

The Supreme Court has "repeatedly made clear that although [Title VII] mentions specific employment decisions with immediate consequences, the scope of the prohibition is not limited to economic or tangible discrimination." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1986) (internal quotations omitted); *EEOC v. WC&M Enter., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007).  "[I]t covers more than terms and conditions in the narrow contractual sense."  *National R.R. Passenger Corp.*, 536 U.S. at 116 (quoting *Faragher*, 524 U.S. at 786) (internal quotations omitted).  "The phrase 'terms, conditions, or privileges of employment' [of 42 U.S.C. § 2000e  2(a)(1)] evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment, which includes

---

[2] Group 1 alludes to the availability of this defense to employers but does not argue that the defense applies in this case.

requiring people to work in a discriminatorily hostile or abusive environment." *National R.R. Passenger Corp.*, 536 U.S. at 116 (quoting *Harris*, 510 U.S. at 21).  Thus, "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated."  *WC&M Enter., Inc.*, 496 F.3d at 399 (quoting *Harris*, 510 U.S. at 21).

        To be actionable, the work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Faragher*, 524 U.S. at 787.  To determine whether an environment was objectively offensive, courts consider the totality of the circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance.  *WC & M Enters., Inc.*, 496 F.3d at 399.  "Workplace conduct is not measured in isolation." *Ramsey*, 286 F.3d at 268 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001)).  For a hostile working environment to be deemed sufficiently hostile, all of the circumstances must be taken into consideration.  *Id.*  "No single factor is determinative. In short, a showing that the employee's job performance suffered is simply a factor to be considered, not a prerequisite."  *WC&M Enter., Inc.*, 496 F.3d at 399-400 (internal citation omitted).  "[E]ven without regard to . . . tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality."  *Id.* (quoting *Harris*, 510 U.S. at 22).

**Memorandum Opinion and Order – Page 9**

Not all harassment in the workplace is actionable.  The "mere utterance of an . . . epithet [that] engenders offensive feelings in a[n] employee[ ] does not sufficiently affect the conditions of employment."  *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999) (citation omitted).  Likewise, "conduct that sporadically wounds or offends but does not hinder a female employee's performance, would not serve [Title VII's] goal of equality."  *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996).  On the other hand, a single incident of harassment that is sufficiently severe or a "continuous pattern of much less severe incidents of harassment" may give rise to a viable Title VII claim for hostile work environment under the totality of the circumstances test.  *WC&M Enter., Inc.*, 496 F.3d at 400.

The facts of this case are analogous to those in *WC & M Enterprises*, *Incorporated*.  In that case, the plaintiff, Mohommed Rafiq, was called "Taliban" by coworkers multiple times per day, even after repeated requests for his coworkers to stop.  *WC & M Enters., Inc.*, 496 F.3d at 396. Rafiq's manager also called him "Taliban" on four or five occasions.  *Id.*  Rafiq was also often referred to as "Arab," even though Rafiq told his coworkers on numerous occasions that he was from India. *Id.* at 397.  Rafiq's coworkers mocked his religious dietary restrictions and prayer rituals.  *Id.*

The Fifth Circuit determined that the evidence showed Rafiq was subjected to verbal harassment on a regular basis for a period of approximately one year.  *Id.* at 400.  The court also concluded that "Rafiq was sporadically subjected to additional incidents of harassment, such as his co-workers' comments on September 11, 2001, which suggested that he was somehow involved in the terrorist attacks against the United States; [a coworker's] statement that Rafiq should 'just go back where [he] came from;' and [a supervisor's] October 16, 2002 written warning, which stated

**Memorandum Opinion and Order – Page 10**

that Rafiq was acting like a 'Muslim extremist.'" *Id.*  The court noted that a regular pattern of frequent verbal ridicule or insults such as that sustained by Rafiq over a long period of time can constitute severe or pervasive harassment sufficient to violate Title VII. *Id.* at 400.

The conduct experienced by Alzuraqi occurred over a shorter six-month period, but the harassment was similarly frequent in nature.  Alzuraqi presented evidence that, three to four times per week during the six months that he was employed by Courtesy Nissan, Turner referred to him as a "towelhead"; "raghead"; "rock thrower"; "sand nigger; "terrorist"; "fucking Palestinian"; and "fucking Muslim." Pl.'s App. 2, ¶ 4(a)-(h).  On one occasion, Turner told Alzuraqi that he was glad that Alzuraqi was not going to have any more kids, because that meant fewer Palestinian kids in the world.  *Id.* ¶ 4(I).  Although Turner's derogatory comments regarding Alzuraqi's age were less severe in nature, they were similarly frequent, occurring one to two times weekly throughout the entire time Alzuraqi was employed by Courtesy Nissan from October 2009 to April 2010.  Moore also occasionally joined Turner in commenting about Alzuraqi's "old" age.  Alzuraqi complained early on and frequently to Lindsey about Turner's harassing conduct, but Lindsey did not take any action before leaving the company, and Turner was permitted to continue with his course of harassing conduct undeterred.  Alzuraqi presented testimony that Turner made the work place feel like a "war zone." Alzuraqi therefore planned his work in an attempt to minimize his contact with Turner and would frequently close and lock the door to his office to avoid Turner.  Although his performance did not suffer as a result of Turner's conduct, Alzuraqi states in his declaration that he was "emotionally distraught" as a result of Turner's conduct and remarks about his religion and heritage.  Alzuraqi further states that Turner's remarks distracted him, made the work environment

at Courtesy Nissan more stressful, and made it more difficult for him to perform his duties as finance manager.

In addition to his own testimony, Alzuraqi presented the deposition testimony of Lindsey and Saul Amaya, the other finance manager at Courtesy Nissan.  Lindsey acknowledged that Turner would use names like "old man" when referring to Alzuraqi but only could only recall approximately six instances in six months.  He also heard Turner use the terms "Muslin" and "towelhead," but thought this happened only twelve times.  Lindsay considered Turner's use of such language as friendly locker-room banter among friends.  Amaya testified that frequently during heated arguments about deals, Turner would refer to Alzuraqi as "Muslim" or "terrorist" and names like "old man." Pl.'s App. 23-24.  Alzuraqi was also called "old man," "old fart," or "old finance guy" during finance meetings, and Amaya heard Moore refer to Alzuraqi on the floor of the dealership as "Muslin" or "old man."  *Id.* 20, 23.   During breaks at work, Alzuraqi expressed his frustration about the mistreatment to Amaya.  *Id.* 22.  Amaya described Alzuraqi as looking "discouraged" and testified that Alzuraqi would confide in him that he felt "like crap," "bad, insulted . . . under pressure" as a result of the name-calling and "being corralled in his office."  *Id*. 27.  Amaya described "being corralled in his office" as something Turner would frequently do to Alzuraqi during heated arguments when the name-calling occurred: "Meaning when . . .  somebody comes in your door, and then    which is your boss at that point . . .  and try to quiz you; to me I call it corral.  You got no exit," such that Alzuraqi would be stuck or trapped in his office.  *Id.*

Applying the totality of the circumstances test, the court concludes that Alzuraqi has presented sufficient evidence to raise a genuine dispute of material fact as to whether the harassment

that he suffered was sufficiently severe *or* pervasive as to create a hostile work environment.  While none of the incidents alone is likely enough to establish severe or pervasive harassment, when considered together and viewed in the light most favorable to Alzuraqi, the evidence demonstrates a frequent and continuous pattern of harassment over a period of six months that is sufficient for a reasonable jury to conclude that Alzuraqi established a claim of discrimination under Title VII based on religion and national origin.

Regarding Defendant's contention that "terms like 'old fart' have been held by the Fifth Circuit to be insufficient to establish discrimination," Def.'s Mot. 6, the court, after reviewing *Waggoner v. City of Garland*, determines that it is factually distinguishable.  *Waggoner* is not a hostile work environment case.  Unlike this case, it involved only isolated statements by the defendant that included the term "old fart," whereas this case involves a pattern of behavior and comments that occurred regularly over a six-month period of time.  Moreover, the court in *Waggoner* did not hold that remarks like "old fart" are never actionable.  Rather, the court held merely, based on the facts of that case, that "stray remarks" consisting of two arguably age-related statements made regarding the plaintiff by the head of the department where the plaintiff worked were insufficient to establish age discrimination.  *Waggoner*, 987 F.2d at 1166.  Such remarks, however, have been held to be actionable if, for example, they are direct and indicate that the defendant intended to use age as a factor in its decision making process to eliminate positions.  *See, e.g., Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 254 (5th Cir. 1996) (distinguishing *Waggoner* and affirming the district court's denial of the defendant's motion for judgment as to the plaintiff's age discrimination claim).

**Memorandum Opinion and Order – Page 13**

The court further disagrees that Alzuraqi's deposition testimony regarding his job performance is fatal to his hostile work environment claim.  In *WC&M Enterprises, Incorporated*, the court rejected a similar argument by the defendant:

> [T]he district court held that even if Rafiq could prove that any harassment occurred, "he has not shown that it was so severe that it kept him from doing his job." In so holding, the district court applied an incorrect legal standard. Whether Rafiq lost sales as a result of the alleged harassment is certainly relevant to his hostile work environment claim; but it is not, by itself, dispositive. The district court erred in concluding otherwise.

496 F.3d at 400.  The court explained that evidence that Rafiq was able to perform his job despite the defendant's harassment was not by itself dispositive because "[n]o single factor is determinative. In short, a showing that the employee's job performance suffered is simply a factor to be considered, not a prerequisite."  *Id*. at 399-400 (internal citation omitted).  Here, even absent evidence that the harassment affected Alzuraqi's performance, the evidence shows that the combined, frequent and continuous derogatory remarks by Turner and Moore created a work environment that was abusive to Alzuraqi because of his age, religion, and national origin.  The court therefore concludes that Alzuraqi has come forward with sufficient evidence to raise a genuine dispute of material fact as to his hostile work environment claim.

Moreover, Group 1's reliance on the "same actor inference" argument is misplaced.  The "same actor inference" rule was first adopted by the Fifth Circuit in *Brown v. CSC Logic, Incorporated.*  The court explained this rule as follows: "[c]laims that employer animus exists in termination but not in hiring seem irrational. From the standpoint of the putative discriminator, [i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job."  82 F.3d at 658 (quoting

*Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991)) (quotation marks and citations omitted). According to *Proud*, "The relevance of the fact that the employee was hired and fired by the same person within a relatively short time span comes in at the third [or pretext] stage of the *[McDonnell Douglas* prima facie case] analysis." 945 F.2d at 798. When the same supervisory employee hires and fires a plaintiff within a short period of time, "a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Id.* While evidence that the same actor who hires and fires an employee creates a strong inference that "the employer's stated reason for acting against the employee is not pretextual such that discrimination was not [the] factor in the employment decision," the inference does not automatically dispose of a plaintiff's discrimination claim. *Id.*

In expressing its approval of *Proud* and the "same actor inference" rule, the court in *Brown* did "not rule out the possibility that an individual could prove a case of discrimination in a similar situation." *Brown*, 82 F.3d at 658. The court instead held only "that the facts in this particular case are not sufficiently egregious to overcome the inference that CSC Logic's stated reason for discharging Davis was not pretext for age discrimination." *Id.* The court therefore concluded that the plaintiff "failed to meet his evidentiary burden on the issue of pretext." *Id.* Thus, evidence that the same actor hired and fired the plaintiff does not automatically dispose of a plaintiff's discrimination claim but creates only a strong inference that discrimination was not a determining factor. *Id.*; *Proud*, 945 F.2d at 7978. *Brown* has been abrogated insofar as it established a formal four-part test to determine if age-related remarks by an employer's personnel may serve as sufficient

evidence of age discrimination, but it remains authoritative in other respects.  *See Russell v.*

*McKinney Hosp. Venture*, 235 F.3d 219, 226 n.10 (5th Cir. 2000).

The court declines to apply the "same actor inference" rule to Plaintiff's hostile work

environment claims because Group 1 does not point to, and the court was unable to find, any case

in this circuit that has applied the inference in a case involving a hostile work environment claim.

Accordingly, Group 1 is not entitled to judgment on Alzuraqi's hostile work environment claims

based on age, religion, and national origin.  Moreover, even if the court applied the rule, it does not

necessarily defeat hostile work environment claims based on age, religion, or national origin.  A

reasonable jury may decide that, despite Turner being the same person who hired and fired Alzuraqi,

a hostile work environment nevertheless existed.

### B.     Discrimination Claims Based on Age, Religion, and National Origin

Alzuraqi contends that Group 1 subjected him to disparate treatment on the basis of his age,

religion, and national origin in violation of Title VII and the ADEA when it distributed customer

assignments in an unfair[3] manner and terminated his employment.  Group 1 contends that Alzuraqi

cannot establish a prima facie case of discrimination. Even if he is able to establish a prima facie

case, Group 1 asserts that Alzuraqi cannot overcome its legitimate, nondiscriminatory business

reasons for its handling of customer assignments and firing Alzuraqi.

---

[3] Although Alzuraqi does not allege in his Complaint that customer assignments were distributed in a discriminatory manner, this issue was addressed during his deposition, and Group 1 moved for summary judgment on on Alzuraqi's Title VII and ADEA discrimination claims that relate to customer assignments. The court therefore addresses the parties' contentions regarding the viability of Alzuraqi's Title VII and ADEA discrimination claims based on customer assignments.

   **1.**  **Standard Applicable to ADEA and Title VII Claims Based on Circumstantial Evidence**

  Title VII prohibits discrimination on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-04 (1973), applies to ADEA and Title VII cases based on circumstantial evidence of discrimination. *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010). The court concludes and both parties acknowledge that the *McDonnell Douglas* burden-shifting framework applies to Plaintiff's ADEA and Title VII discrimination claims based on age, religion, and national origin because he relies on circumstantial evidence of discrimination. Under this framework, for his Title VII claims, Alzuraqi must establish a prima facie case of discrimination by showing that: (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances. *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009). For a prima facie case age discrimination claim, Alzuraqi must show that: "(1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise

discharged because of his age." *Phillips v. Leggett & Platt, Inc.*, 658 F.3d 452, 455 (5th Cir. 2011); *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007) (citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004)).; *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005).

In the context of establishing a *prima facie* case of discrimination, an adverse employment action means an "ultimate employment decision," such as "hiring, granting leave, discharging, promoting, or compensating."[4] *McCoy v. City of* Shreveport, 492 F.3d 551, 559 (5th Cir. 2007). Title VII does not cover "every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003) (quoting *Burger v. Central Apartment Mgmt.*, 168 F.3d 875, 878 (5th Cir. 1999)). An employment action that "does not affect job duties, compensation, or benefits" is not an adverse employment action. *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004), *abrogated in part on other grounds by Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). Major changes in compensation, duties, and responsibilities constitute ultimate employment actions. *Pegram*, 361 F.3d at 282 n.8 (citing *Hunt v. Rapides Health Care Sys., LLC*, 277 F.3d 757, 770 (5th Cir. 2001)). Allegations of unpleasant work meetings, verbal reprimands, improper work requests, and unfair treatment do not constitute actionable adverse employment

---

[4] The Fifth Circuit's precedent recognizing only "ultimate employment decisions" as actionable adverse employment actions in the discrimination context was unaffected by the Supreme Court's ruling in *Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53, 61-65 (2006), which abrogated the "ultimate employment decision" standard in the *retaliation* context. Thus, the "ultimate employment decision" standard remains controlling for Title VII and ADEA discrimination claims. *McCoy v. City of Shreveport*, 492 F.3d 551, 560 (5th Cir. 2007). The "ultimate employment decision" standard therefore controls Alzuraqi's discrimination claims under Title VII and the ADEA. He has not asserted a retaliation claim.

actions.  *King v. Louisiana*, 294 F. App'x 77, 85 (5th Cir. 2008) (citing *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000)).

If Alzuraqi establishes a prima facie case, the burden shifts to Group 1 to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011); *Machinchick*, 398 F.3d at 350.  Group 1's burden in this regard is one of production, not persuasion, and it "can involve no credibility assessment."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).  If Group 1 meets this burden, the case moves to the pretext stage where the question for summary judgment is whether a rational fact finder could find that [Group 1] discriminated against [Alzuraqi] on the basis of [age, religion, or national origin]." *Pratt v. City of Houston, Tex.*, 247 F.3d 601, 606 (5th Cir. 2001).  At this stage, for his Title VII claims of national origin and religion, Alzuraqi must "offer sufficient evidence to create a genuine issue of material fact either (1) that [Group 1's] reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that [Group 1's] reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is [Alzuraqi's] protected characteristic (mixed-motives alternative)."[5]  *Vaughn*, 665 F.3d at 636 (citation omitted).[6]

Alzuraqi, as the plaintiff, "must rebut each nondiscriminatory reason articulated by [his] employer."  *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).  Alzuraqi may establish pretext "either through evidence of disparate treatment or by showing that the employer's proffered

---

[5] As discussed later, the mixed-motives alternative applies only to Title VII claims.  It no longer applies to ADEA claims.

[6] *Vaughn* is a Title VII case involving race discrimination; however, the same standard also applies to Title VII cases involving discrimination based on religion and national origin.

**Memorandum Opinion and Order – Page 19**

explanation is false or unworthy of credence." *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010) (citation and internal quotation omitted); *Laxton*, 333 F.3d at 578; *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002) (A "plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation."). In cases involving circumstantial evidence, a verbal remark or comment that exhibits discriminatory animus may be used to establish pretext or used as additional evidence of discrimination if it: (1) "demonstrate[s] discriminatory animus"; and (2) was "made by a person primarily responsible for the adverse employment action or by a person with influence or leverage over the formal decisionmaker." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012); *Laxton*, 333 F.3d at 583.

In Title VII cases, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," and may therefore be enough to prevent summary judgment or judgment as a matter of law. *See Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. at 148; *Sandstad*, 309 F.3d at 897. This showing, however, is not always enough to prevent summary judgment "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 134-35, 148 ("Certainly there will be instances where, although the plaintiff has established a prima facie case and introduced sufficient evidence to reject the employer's explanation, no rational factfinder could conclude that discrimination had

occurred."). On the other hand, in the context of an unlawful discrimination claim under Title VII, summary judgment is inappropriate if: "the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that [religion or national origin] was a determinative factor in the actions of which plaintiff complains." *Pratt*, 247 F.3d at 606-07 (internal quotation marks omitted) (quoting *Vadie v. Mississippi State Univ.*, 218 F.3d 365, 373 n.23 (5th Cir. 2001)). Thus, "[w]hether summary judgment is appropriate in any particular case depends on a variety of factors, including 'the strength of the prima facie case, the probative value of the proof that the employer's explanation is false and any other evidence that supports the employer's case and that properly may be considered.'" *Pratt*, 247 F.3d at 606 (quoting *Reeves*, 530 U.S. at 148 ).

Unlike Title VII, the ADEA "does not authorize an alleged mixed-motives age discrimination claim." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 168 (2009). It is therefore insufficient under the ADEA for a plaintiff to show that age was a motivating factor. *See id.* Instead, a plaintiff bringing a disparate-treatment claim under the ADEA must prove that age was the "but-for" cause of the challenged adverse employment action. *Id.*; *Moss*, 610 F.3d at 922. "But-for" cause means the cause without which the challenged adverse employment action would not have occurred. *See Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996) (citations omitted).

## 2.    Alleged Unfair Allocation of Customer Assignments or Finance Deals

Alzuraqi contends that finance deals were being distributed in a way that was discriminatory toward him. Alzuraqi testified that customer finance deals were supposed to be distributed equally between the two finance managers or in accordance with the company's procedure for allocating

customers finance deals.  Alzuraqi explained in his deposition that Courtesy Nissan's procedure required, for example, that the first customer would go to Alzuraqi and the second customer would go to the other finance manager, and so on in a sequential order alternating each time between the managers.  Pl.'s App., Alzuraqi Dep. 151-52.[7]  Alzuraqi testified that after Sung replaced Lindsey as finance director, the assignment of customer finance deals was particularly unfair with Sung frequently assigning customer deals to Amaya and Sung's "buddy," who replaced Amaya in March or April of 2010.  *Id.* 153-54.  When Alzuraqi complained, Sung would always have an excuse as to why a deal was assigned to Amaya or his "buddy." *Id.* 154.  Alzuraqi also confronted Lindsey about the perceived preferential assignment of customers, and Lindsay told him that it was Turner who ultimately made the decision about the assignment of finance deals.  *Id.* 150-51.  Alzuraqi testified that he believed that a decision was made to distribute the finance deals more favorably to Amaya and Amaya's replacement because "they already made the decision to get rid of me, and they wanted to make sure that my numbers [were] under the threshold of . . .  a business manager."  *Id.* 155.

Group 1 contends that Alzuraqi cannot establish a prima facie case to show that customer assignments or deals were assigned in a discriminatory manner.  Even if Alzuraqi can establish a prima facie case, Group 1 contends that Courtesy Nissan had a legitimate nondiscriminatory business reason for the way it allocated customer assignments, that is, Courtesy Nissan used a

---

[7] In his response to Defendant's summary judgment motion regarding customer assignments, Alzuraqi cites to his deposition testimony at pages 53 to 60 of his appendix; however, these pages, which appear at the end of his appendix, were not assigned appendix numbers as required by Civil Local Rule 56.  The court therefore cites to the deposition pages when referring to this testimony.

nondiscriminatory rotation process whereby customer assignments alternated between the two

finance managers.  According to Group 1, exceptions to this process were made when a customer

required special language assistance in that a customer would be assigned to a finance manager

familiar with the language spoken by the customer.  In addition, if a customer was waiting, he or she

would be assigned to the first available finance manager.

> In his response to Defendant's summary judgment motion, Alzuraqi contends that he:
>
> has given extensive controverting testimony that the finance deals were being
> distributed in a way that was discriminatory towards him. APP. 53-60. That
> testimony specified that Alzuraqi was informed that Turner was behind the deal
> assignments.  *Id*. Considering the totality of circumstances, it is reasonable for the
> trier-of-fact to conclude that the disparate case assignment was due to Turner's
> demonstrated animosity toward Alzuraqi's age, national origin and/or religion.

Pl.'s Resp. 9.  In addition to the court's discussion above of Alzuraqi's deposition testimony

regarding the perceived unfair distribution of customer assignments, Alzuraqi presented evidence

to show that he is a member of a protected class with regard to his age (51), religion (Muslim), and

national origin (Palestinian).  Neither party specifically addresses whether Alzuraqi was qualified

for the finance manager position that he held, and there does not appear to be any dispute in this

regard.  In any event, there is some evidence in the record that can be construed liberally as satisfying

this element and the low threshold necessary at the prima facie stage.

There is likewise no discussion by the parties as to whether the alleged unfair or unequal

assignment of dealership customers to the two finance managers at Courtesy Nissan constitutes an

adverse employment action.  Although Alzuraqi testified that the distribution of customer finance

deals could affect his numbers and whether he received a bonus, and low numbers in this regard

could result in his being fired, he admits that the alleged unfair distribution of customer finance deals did not affect his performance or compensation. It is also undisputed that his employment was not terminated due to low numbers or performance. The court therefore concludes that the alleged unfair distribution of customer finance deals does not qualify as an adverse employment action. As Alzuraqi has failed to show that he suffered an adverse employment action with regard to the distribution of customer finance deals, he has not raised a genuine dispute of material fact, and his ADEA and Title VII discrimination claims that are based on this alleged conduct by Group 1 necessarily fail. Group 1 is therefore entitled to judgment as a matter of law on these claims.

### 3.    Termination of Employment

Group 1 contends that Alzuraqi cannot establish a prima facie case to show that it engaged in a discriminatory employment practice when it terminated his employment. Further, Group 1 contends that, even if Alzuraqi can establish a prima facie case of discrimination based on age, religion, or national origin, it has articulated a legitimate nondiscriminatory business reason for terminating Alzuraqi's employment, and that Alzuraqi's subjective belief that he was terminated for discriminatory reasons is insufficient to establish a genuine dispute of material fact. Group 1 states that it terminated Alzuraqi's employment because of "serious customer relation problems." Def.'s Mot. 12. According to Group 1, Courtesy Nissan and Turner received customer complaints that Alzuraqi had used "strong-arm tactics and deceitful negotiations" to sell financial products. *Id.*

Other than reciting the applicable legal standard, neither party specifically addresses whether and why the evidence in this case is sufficient or insufficient to support a prima facie case of discrimination based on age, religion, or national origin. For the reasons previously explained, the

court concludes that Plaintiff has satisfied the first three elements of a prima facie case.  The court therefore addresses whether he has satisfied the fourth element of a prima facie case with regard to his ADEA and Title VII claims.

### a.    Title VII Claims Based on National Origin and Religion

With regard to his Title VII claims, the court determines that Plaintiff has failed proffer evidence of  a comparator who was treated more favorably "under nearly identical circumstances," which is satisfied when "the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Lee*, 574 F.3d at 260.  Here, the only employees who held the same position as Alzuraqi was Amaya and Amaya's replacement.    Both shared the same supervisor as Alzuraqi; however, there is no evidence that Courtesy Nissan customers lodged any complaints against Amaya or his replacement, let alone complaints that were similar in nature to those allegedly made by customers regarding Alzuraqi's negotiation tactics.  Moreover, while there is evidence that Amaya left Courtesy Nissan in April 2010 and was still unemployed at the time he was deposed, it is unclear whether he was fired or left the company voluntarily.  Accordingly, Alzuraqi has failed to establish a prima facie case of discrimination under Title VII based on national origin and religion, that is, Alzuraqi failed to show that Amaya and Amaya's replacement were treated more favorably in response to similar customer complaints because of his religion or national origin.  Group 1 is therefore entitled to judgment as a matter of law on these claims.  Having determined that Alzuraqi has failed to establish a prima facie case, the court need not go any further

in its analysis as to these claims and therefore does not address the parties' remaining arguments regarding Plaintiff's Title VII discrimination claims.

### b.    ADEA Claim

To satisfy the fourth element of his ADEA claim, Alzuraqi presented some evidence to show that he was "discharged because of his age." *Rachid*, 376 F.3d at 309.   Specifically, Alzuraqi presented evidence that he was frequently referred to as "old man," and "old fart" at least one to two time per week throughout the six months he was employed by Courtesy Nissan, up until the time he was fired.  Further, Alzuraqi was the oldest person who worked at the dealership, and on occasion Turner and Moore would remark that Alzuraqi could not remember things because he was "old." These comments establish discriminatory animus towards Alzuraqi close to the time that his employment was terminated. Alzuraqi has therefore established a prima facie case of discrimination based on age.   The burden therefore shifted to Group 1 to set forth a legitimate nondiscriminatory business reason for firing Alzuraqi in April 2010.

Group 1 contends that Alzuraqi's employment was terminated because Courtesy Nissan received customer complaints about Alzuraqi's negotiation tactics in handling finance deals. Contrary to Alzuraqi's assertion, Group 1 need not prove that its reason for firing Alzuraqi was legitimate and nondiscriminatory.   To meet its burden, Group 1 is only required to articulate a legitimate, nondiscriminatory business reason, and its burden in this regard is one of production, not persuasion, that "involve[s] no credibility assessment." *St. Mary's Honor Ctr.*, 509 U.S. at 509. Thus, the issue is not, as Plaintiff contends, whether "[i]n the absence of legitimate, non-discriminatory reasons proven on summary judgment as a matter of law, the evidence demonstrates

that there is a fact question as to whether Turner's derisive attitude toward Alzuraqi's age was the

but-for reason that he 'didn't fit in.'" Pl.'s Resp. 9.  Instead, the issue is whether Alzuraqi has met

his burden of coming forward with evidence that Group 1's proffered reason for his termination was

merely a pretext for intentional age discrimination.

Although not required to, Group 1 presented evidence to support its reason for terminating

Alzuraqi's employment that included Turner's declaration and deposition testimony, and two

customer surveys that were attached to Turner's declaration.  In paragraph five of his declaration,

Turner states:

> 5.      Alzuraqi began to display serious customer relation problems. This resulted
> in poor customer satisfaction survey results.  True and correct examples of
> the surveys received are attached to this declaration as Exhibit A.  Most
> troubling to me was that customers were complaining that Alzuraqi used
> strong-arm tactics and deceitful negotiations when trying to sell financial
> products. Alzuraqi's direct supervisor, F&I Director David Sung and General
> Sales Manager Todd Wright both approached me with similar complaints. I
> spoke with Alzuraqi on several occasions, yet Alzuraqi refused to
> acknowledge that he used improper sales methods or inappropriately
> addressed customers. After continuing to receive complaints, I decided to
> terminate Alzuraqi's employment.

Def.'s App. 52-53.  Attached to Turner's declaration are copies of two web surveys submitted by

Courtesy Nissan customers who expressed dissatisfaction with financing in leasing or purchasing

an automobile.  *Id.* 52.  The names of the customers do not appear on the surveys.  *See id.* 54-57.

Instead, the customers and transactions are referenced by customer, vehicle, and sales identification

numbers.

The first survey is dated December 2, 2009.  In it, the customer expresses overall

dissatisfaction with the experience in purchasing an automobile at Courtesy Nissan and provides the

following additional comments at the bottom of the survey, which appear to have been inadvertently cut off during printing: "[O]ur salesman Mo was great. [O]n the other hand the f[]inance person steve was rude and dishonest.  [H]e is the reason that this will be the 4th and last . . ."  Def.'s App. 54.  According to Alzuraqi's and Amaya's deposition testimony, Alzuraqi was known as and went by the name "Steve." Alzuraqi also used this name on his resume.  *Id.* 5; Pl.'s App. 25.

The second survey, dated January 4, 2010, was forwarded by e-mail to Lindsay and Turner on January 5, 2010, by Jim Homminga ("Homminga") at Group 1.  It is unclear from the record what position Homminga held with Group 1 at the time of the e-mail.  In the survey forwarded by Homminga, the customer complains about the finance office "playing tricks end cheating customers." Def.'s App. 57.  The customer goes on to explain:

> I leased a new Nissan Maxima 2010 on 12/23/09. The salesperson was reasonable and I agreed on a deal for the lease. So far so good. Then starts the documentation and finance office involvement where I was tricked into paying $920 more on the lease . . . All key factors of the deal were altered . . . without explanation and disclosure. . . . I soon realized I was tricked. If 36 months is a better lease why does the salesperson sell 39 months and then finance changes the terms to confuse the customer. Neat trick. But a person with some common sense can make out pretty soon. Once I realized I was tricked I discussed the issue with the salesperson[,] finance & management. I wasted 2 hours discussing with various people. Finally the manager tried to strike a deal    I would be refunded some money 'ONLY AND AFTER IF I PROVIDE AN EXCELLENT FEEDBACK'.  NO promises and no Checks until the feedback is done. Is this called blackmail? . . .  As stated above the salesperson was good but is of no use if he cannot get the deal thru with the terms negotiated. He passed on the fault to the 'management'.  As a loyal Nissan customer for the last 12 years I did not expect this from Nissan. This kind of tactic unnecessarily creates a bad name for the car manufacturer (who is at no fault. I love the car). I will probably never again buy a Nissan inspite [sic] of [it] being a good car because of unfair sales tactics. As I said I have accepted my $920 loss bu[t] will [be sure to] bring it to the [attention] of Consumer Awareness Websites[,] Nissan Lease Management[,] and [the] Better Business Bureau.

*Id.* (internal quotation marks appear in original).  Unlike the December 2009 survey, the customer in this survey does not refer to the finance person by name but instead refers generally to the finance office.

In his deposition, Turner similarly referred to Alzuraqi as "Steve," and testified that Sung had approached him about a customer complaint regarding Alzuraqi.  Turner also received a telephone call from a customer complaining about Alzuraqi:

> [M]y finance director came in one day, was like, "Look, he's got this bad CSI.[8] He's got this.  He's not following through.  He's got a negative attitude."
> I go talk to Steve, . . . "Come on, man, get your attitude together."
> [Steve says] "Oh, C.J., you know. I'm . . . [a] good man. You know me. I'm doing what I'm supposed to do."
> Then I get this phone call from a customer; Steve's jamming products on customers and stuff.

*Id.* 43.

Alzuraqi does not assert any objections to Turner's deposition testimony that pertains to customer complaints.  He does, however, object to paragraph five of Turner's declaration and the attached customer surveys on the grounds that this evidence is inadmissible hearsay. Alzuraqi contends that the surveys and "Turner['s] out-of-court, non-specific statements allegedly made by customers, Finance Director David Sung and Finance Manager Todd Wright" constitute hearsay because they are out of court statements offered for the truth of the matter asserted.  Pl.'s Resp. 6. In addition, Alzuraqi argues that the surveys are not relevant or reliable because; (1) "there is no

---

[8] Neither party and none of the witnesses define or explain what the term "CSI" means. Based on the court's review of the testimony, it appears that CSI refers to customer survey forms used by Nissan that were used to rate or score not only the performance of the individual sales and finance managers at Courtesy Nissan, but also the dealership itself.  *See* Pl.'s App. 12-13; Def.'s App. 43.

evidence that any of these alleged complaints were investigated or corroborated and as such, constitute the only evidence of such claims"; (2) the customers are not identified by name; (3) the customer complaints occurred four months before Plaintiff's termination; and (4) the complaint or complaints do not specifically reference Plaintiff and therefore could have been referring to Amaya. *Id.* 5.

Group 1 does not respond to Alzuraqi's objections to evidence. Instead, it replies that Alzuraqi has failed to meet his summary judgment burden because, instead of coming forward with evidence that its legitimate business reason for terminating Alzuraqi's employment is a pretext, he relies on the same evidence used to support his prima facie case. Group 1 asserts that Alzuraqi relies on his subjective belief that he was fired because of his protected status while at the same time claiming that he does not know why he was fired. Even assuming that the statements in Wright's declaration are true, Group 1 contends that Alzuraqi "cannot and does not dispute that Turner received such customer complaints directly from customers." Def.'s Reply 3. As a result, Group 1 maintains that Alzuraqi has failed to satisfy his summary judgment burden. In addition, Group 1 contends that the "same actor" inference is pertinent and should be applied to Alzuraqi's discrimination claim because "it makes little sense that Turner hired him only to terminate his employment six months later." Reply 3.

As to Alzuraqi's objection to Defendant's evidence, the court determines that the December 2, 2009 and January 4, 2010 customer surveys are double hearsay. Likewise, Turner's declaration statements regarding what customers told him directly or what Sung told Turner about customers complaints contained in surveys is hearsay. Specifically, the customer complaints made to Turner

**Memorandum Opinion and Order – Page 30**

by telephone, the customer surveys, and the complaints or comments by customers contained in the surveys are hearsay because Group 1 offers them for the truth of the matter asserted, that is, Group 1 relies on the evidence and declaration statements by Turner to show not only that Turner received or had notice of the customer surveys and telephonic complaints, but also to show, based on the contents of the surveys and specific customer statements made to Turner, that the customer surveys and telephonic complaints pertained to Alzuraqi and his handling of finance deals in an inappropriate and objectionable manner. *See* Def.'s Reply ("Customers complained to Turner that Alzuraqi used strong-arm tactics and deceitful negotiations when trying to sell financial products."). Even if Group 1 could show that the surveys themselves fall within the business records exception to hearsay, they would still need to show that the contents of the surveys are nonhearsay or fall within an exception because the source of the comments and information in the surveys is an outsider. *Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 271 (5th Cir. 1991); *see also Hendricks v. Ford Motor Co.*, No. 4:12CV71, 2012 WL 4478308, at *102 (E.D. Tex. Sept. 27, 2012) (concluding based on the reasoning in *Wilson v. Zapata Off-Shore Co.*: "Customer complaints in a company's files are out-of-court statements. If they are offered to prove the truth of the matter asserted    that the incidents complained of in the report occurred as reported    they are hearsay and are inadmissible. While the record of the complaints, if made in the regular course of business, may fall under the business records exception, the consumer complaints themselves are hearsay within hearsay and must fall under their own exception.") (internal citation omitted). As explained by the court in *Wilson v. Zapata Off-Shore Company*:

> Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person. If both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business, the multiple hearsay is excused by Rule 803(6). However, if the source of the information is an outsider, as in the facts before us, Rule 803(6) does not, by itself, permit the admission of the business record. The outsider's statement must fall within another hearsay exception to be admissible because it does not have the presumption of accuracy that statements made during the regular course of business have. Further, Federal Rule of Evidence 805 requires that all levels of hearsay satisfy exception hearsay requirements before the statement is admissible.

939 F.2d at 271 (internal citations omitted). Moreover, only one of the two surveys can be construed as referring to Alzuraqi, who went by the name "Steve." The probative value of the January 2010 survey is therefore questionable without further testimony or evidence by Group 1 to link Alzuraqi to the transaction at issue in the survey. Further, without reference to the contents of the customer surveys or complaints, Turner's declaration statement, that "Alzuraqi began to display serious customer relation problems. This resulted in poor customer satisfaction survey results," is conclusory. The court therefore determines that paragraph 5 of Turner's declaration and the two surveys referred to in his declaration are inadmissible for purposes of this summary judgment motion.

Although not objected to by Plaintiff, the court concludes that the portion of Turner's deposition testimony referred to above is also inadmissible hearsay for the same reasons that Turner's declaration and the surveys are hearsay. The court therefore does not consider this evidence in ruling on Group 1's summary judgment motion.[9] Accordingly, Alzuraqi's objection is **sustained.**

---

[9] If Group 1 intends to rely at trial on these or other customer surveys or testimony regarding customer complaints, the court will revisit the issue again, as necessary, during the pretrial conference after receiving additional briefing by the parties regarding the admissibility of such evidence.

To establish that Group 1's articulated reason for firing him is not true, but is instead a pretext for discrimination based on age, Alzuraqi relies on evidence that Turner and Moore made comments about his age one or twice a week though out the six-month period that he was employed by Courtesy Nissan.  In addition, Alzuraqi relies on his declaration and deposition testimony in which he denies receiving any customer complaints and states that he was "never told that any customers were complaining about me."  Pl.'s App. 3, ¶ 8.  Alzuraqi acknowledged in this deposition that customer surveys were important to the dealership and managers but insisted that his CSI score was always good: "[W]e really looked at those customer surveys, and we'd try to correct whatever . . . was done wrong, okay.  But I always had a good CSI score everywhere I've been."  Pl.'s App. 12. When asked what benchmark, if any, was used to determine whether a CSI score was good, Alzuraqi explained that if a manager had a good CSI score, he received a bonus.  Alzuraqi testified that he received a bonus "almost every time," including the last two months he was employed at Courtesy Nissan before being fired.  *Id.*  Alzuraqi also presented the declaration of Wright, who states that he does not recall making complaints to Turner about the manner in which Alzuraqi managed his deals or treated customers.  Wright further states that he does not recall asking Turner to fire Alzuraqi.

Normally, a plaintiff's self-serving denial of wrongdoing and conclusory assertion of innocence is insufficient alone to create a fact issue as to the falsity of the defendant's proffered reason for terminating him.  *Jackson*, 602 F.3d at 379.  Similarly, "a dispute in the evidence concerning . . . job performance does not provide a sufficient basis for a reasonable factfinder to infer that [the] proffered justification is unworthy of credence" because "[e]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason. We do

**Memorandum Opinion and Order – Page 33**

not try in court the validity of good faith beliefs as to an employee's competence. Motive is the issue." *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991).  Thus, the issue is not whether the plaintiff actually committed the alleged violation or engaged in the misconduct alleged, but whether the defendant believed in good faith that he did.  *See id.*

Here, Alzuraqi's denial of wrongdoing and the dispute as to his job performance with regard to customer dealings is insufficient alone to create a genuine dispute of material fact as to the falsity of Group 1's proffered reason for terminating him. The court nevertheless determines that this evidence, when combined with other evidence in the record, raises a reasonable inference that Group 1's stated reason for discharging Alzuraqi was a pretext for age discrimination.  This evidence consists of the following: Turner's decision to fire Alzuraqi; Turner's regular and frequent comments regarding Alzuraqi's age that establish discriminatory animus towards Alzuraqi; the proximity of the age-related comments to Alzuraqi's firing; Wright's failure or inability to recall complaining to Turner about the way Alzuraqi handled finance deals; and importantly, Alzuraqi's receipt of regular bonuses based on his customer survey or CSI scores, including the last two months of his employment before being fired.  While it is a close call, particularly since Turner hired and fired Alzuraqi in a short period of time, the court, after viewing the evidence and inferences drawn from that evidence in the light most favorable to Alzuraqi, concludes that a reasonable jury or rational factfinder could find that Alzuraqi's employment was terminated because of his age.  The court will therefore deny Group 1's summary judgment motion as to Alzuraqi's ADEA claim.

IV.     **Objections to Evidence**

The court has only considered evidence that is admissible pursuant to Rule 56 of the Federal

Rules of Civil Procedure and the summary judgment standard herein enunciated.  Accordingly, to

the extent the court has not explicitly addressed all of Alzuraqi's arguments regarding objections to

evidence, the objections are moot and **overruled**.

V.      **Conclusion**

For the reasons stated herein, the court **grants in part and denies in part** Defendant's

Motion for Summary Judgment.  Defendant's Motion for Summary Judgment is **granted** as to

Plaintiff's Title VII and ADEA discrimination claims based on customer assignments and Plaintiff's

Title VII employment termination claims.  Accordingly, these claims are **dismissed with prejudice**,

together with the withdrawn disability discrimination claim, which Plaintiff abandoned and elected

not to pursue in this action.  Genuine disputes of material fact exist as to  Plaintiff's hostile work

environment and ADEA employment termination claims. Defendant's Motion for Summary

Judgment is therefore **denied** as to these claims, which remain for trial.

**It is so ordered** this 1st day of February, 2013.


_Sam A. Lindsay_
Sam A. Lindsay
United States District Judge